**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISION**

| | |
|---|---|
| ISRAEL CARTER, Individually and For Others Similarly Situated<br><br>v.<br><br>J.T. THORPE & SON, INC. | **Case No. 2:24-cv-00644-CB**<br><br>Jury Trial Demanded<br><br>Rule 23 Class Action<br>FLSA Collective Action |

**FIRST AMENDED CLASS & COLLECTIVE ACTION COMPLAINT**

### SUMMARY

1.      Carter brings this class and collective action to recover unpaid wages and other damages from J.T. Thorpe & Son, Inc. (JT Thorpe).

2.      JT Thorpe employed Carter as one of its Hourly Employees (defined below) in Pennsylvania.

3.      Carter and the other Hourly Employees regularly work more than 40 hours a week.

4.      But JT Thorpe does not pay Carter and its other Hourly Employees for all their hours worked.

5.      Instead, JT Thorpe requires Carter and its other Hourly Employees to arrive at a designated location (e.g., a parking lot) and shuttle to their assigned jobsites before "clocking in" for each shift.

6.      Likewise, after "clocking out" for each shift, JT Thorpe requires Carter and its other Hourly Employees to shuttle back to the designated location.

7.      JT Thorpe, thus, does not pay Carter and its other Hourly Employees for the time they spend shuttling to and from the jobsite "off the clock" before and after their shifts.

8.      Rather, JT Thorpe only pays Carter and its other Hourly Employees for the time they work "on the clock"—from when they arrive (and clock in) at the jobsite until they leave the jobsite (and clock out).

9.      JT Thorpe's uniform shuttle practice violates the Pennsylvania Minimum Wage Act (PMWA) by depriving Carter and the other Hourly Employees of overtime wages for all overtime hours worked.

10.     In addition to failing to pay Carter and the other Hourly Employees for all their hours worked, JT Thorpe also fails to pay them overtime at the proper premium rate.

11.     Specifically, JT Thorpe labels certain pay Carter and the other Hourly Employees receive as "per diem" (JT Thorpe's "per diem pay scheme").

12.     JT Thorpe knows this "per diem" should be, but is not, included in its Hourly Employees' "regular rate" of pay for overtime purposes.

13.     JT Thorpe's uniform per diem pay scheme violates the PMWA and Fair Labor Standards Act (FLSA) by depriving Carter and the other Hourly Employees of overtime at rates not less than 1.5 times their regular rates of pay—based on *all* remuneration received—for their hours worked over 40 in a week.

## JURISDICTION & VENUE

14.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

15.     This Court has supplemental jurisdiction over the state-law claims because they arise from a common nucleus of operative facts. 28 U.S.C. § 1367.

16.     This Court has general personal jurisdiction over JT Thorpe because JT Thorpe is registered to do business in the Commonwealth. *See Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122, 134 (2023); *see also* 42 PA. CONS. STAT. § 5301.

17.    Venue is proper because a substantial portion of the events or omissions giving rise to this action occurred in this District and Division. 28 U.S.C. § 1391(b)(2).

18.    Specifically, JT Thorpe employed Carter and the other Hourly employees, and imposed its shuttle practice and per diem pay scheme on them, in and around Beaver County, Pennsylvania, which is in this District and Division.

**PARTIES**

19.    Carter is an adult individual residing in Oklahoma.

20.    Carter's written consent was attached to his Original Complaint.

21.    From approximately July 2021 through June 2022, JT Thorpe employed Carter as a bricklayer.

22.    Throughout his employment, JT Thorpe classified Carter as non-exempt and paid him on an hourly basis.

23.    But throughout his employment, JT Thorpe did not pay Carter for all his hours worked.

24.    Instead, JT Thorpe subjected Carter to its uniform, illegal shuttle practice.

25.    Further, throughout his employment, JT Thorpe did not pay Carter overtime at the proper premium rate.

26.    Instead, JT Thorpe paid Carter under its uniform, illegal per diem pay scheme.

27.    Carter brings this class action on behalf of himself and all other similarly situated hourly JT Thorpe employees in, or based out of, Pennsylvania who were subject to JT Thorpe's illegal shuttle practice and/or per diem pay scheme.

28.    JT Thorpe requires each of these employees to arrive at a designated location (e.g., a parking lot) and shuttle to their assigned jobsites before "clocking in" for each shift.

29.    Likewise, after "clocking out" for each shift, JT Thorpe requires each of these employees to shuttle back to the designated location.

30.    JT Thorpe, thus, does not pay Carter and its other Hourly Employees for the time they spend shuttling to and from their jobsites "off the clock" before and after their shifts.

31.    Further, JT Thorpe pays each of these employees per diems that JT Thorpe knows should be, but are not, included in their regular rates of pay for overtime purposes.

32.    Thus, JT Thorpe uniformly deprives these employees of overtime at rates not less than 1.5 times their regular rates of pay—based on *all* remuneration received—for all hours worked after 40 in a week, including those worked "off the clock," in violation of the FLSA and PMWA.

33.    The FLSA Collective of similarly situated employees is defined as:

> **All hourly JT Thorpe employees who were paid a per diem at any time during the past 3 years until final resolution of this Action (the "FLSA Collective Members").**

34.    Carter also seeks to represent a class under the PMWA pursuant to FED. R. CIV. P. 23.

35.    The putative class of similarly situated employees is defined as:

> **All hourly JT Thorpe employees who worked in, or were based out of, Pennsylvania[1] at any time during the 3 years prior to Carter filing his Original Complaint until final resolution of this Action (the "Pennsylvania Class Members").**

---

[1] The PMWA applies to Pennsylvania workers, regardless of the state in which the work is performed. *Truman v. DeWolff, Boberg & Assocs., Inc.*, No. 07-01702, 2009 WL 2015126, at *2 (W.D. Pa. July 7, 2009) ("In light of the FLSA's explicit recognition that states may offer greater protections to its employees than the FLSA, we are reluctant to find an unstated foreign-work exemption in the PMWA based solely on the fact that the FLSA contains such an exemption."). Courts apply a five-factor test for purposes of the PMWA to determine whether workers are based in Pennsylvania, which include (1) employer's headquarters; (2) employee's physical presence working in Pennsylvania; (3) extent of employee's contact with Pennsylvania Employer, i.e., reporting, direction, supervision, hiring, assignment, and termination; (4) employee's residence; and (5) employee's ability to bring her claim in another forum. *See Matthews v. BioTelemetry, Inc.*, No. 18-561, 2018 WL 3648228, at *3 (E.D. Pa. July 31, 2018).

36.     The FLSA Collective Members and the Pennsylvania Class Members are collectively referred to as the "Hourly Employees."

37.     JT Thorpe is a California corporation headquartered in Richmond, California.

38.     JT Thorpe is registered to do business in the Commonwealth.

39.     JT Thorpe regularly conducts substantial business in Allegheny County, including maintaining an office in Carnegie, Pennsylvania.

40.     JT Thorpe may be served through its registered agent: **Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110**.

## FLSA COVERAGE

41.     At all relevant times, JT Thorpe was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

42.     At all relevant times, JT Thorpe was an "enterprise" within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

43.     At all relevant times, JT Thorpe was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials—such as cell phones, computers, pens, paper, personal protective equipment, etc.—that have been moved in or produced for commerce.

44.     At all relevant times, JT Thorpe has had an annual gross volume of sales made or business done of $1,000,000 each year.

45.     At all relevant times, Carter and the other Hourly Employees were JT Thorpe's "employees" within the meaning of Section 3(e) of the FLSA, 29 U.S.C. § 203(e).

46.     At all relevant times, Carter and the other Hourly Employees were engaged in commerce or in the production of goods for commerce.

47.     JT Thorpe uniformly paid Carter and its other Hourly Employees according to its illegal per diem pay scheme.

48.     JT Thorpe applied its illegal per diem pay scheme to its Hourly Employees regardless of any alleged individualized factors, such as specific job title or geographic location.

49.     By paying Carter and its other Hourly Employees a per diem that it did not include in these employees' regular rate for overtime purposes, JT Thorpe did not pay them at the required overtime rate – based on all remuneration received – when they worked more than 40 hours in a workweek.

50.     JT Thorpe's uniform per diem pay scheme therefore violates the FLSA. 29 U.S.C. § 207(a) & (e).

## FACTS

51.     JT Thorpe bills itself as "the nation's leading industrial service provider of refractory, fireproofing, scaffolding, insulation, and coatings services … specializ[ing] in maintenance, capital projects, outages, turnarounds, and new construction."[2]

52.     To meet its business objectives, JT Thorpe hires workers, like Carter and the other Hourly Employees, who perform the services JT Thorpe markets to its clients.

53.     JT Thorpe uniformly classifies Carter and its other Hourly Employees as non-exempt and pays them on an hourly basis.

54.     Carter and the other Hourly Employees regularly work more than 40 hours a week.

---

[2] https://jtthorpe.com/about-us/ (last visited July 18, 2024).

55.     But JT Thorpe does not pay Carter and its other Hourly Employees for all their hours worked or overtime at the premium rate federal and Pennsylvania law require.

56.     Instead, JT Thorpe subjects Carter and its other Hourly Employees to its uniform, illegal shuttle practice and per diem pay scheme.

57.     While exact job titles and job duties may differ, these employees are subject to the same or similar illegal policies—JT Thorpe's illegal shuttle practice and per diem pay scheme—for similar work.

58.     For example, Carter worked for JT Thorpe as a bricklayer from approximately July 2021 until June 2022.

59.     As a bricklayer, Carter's primary responsibilities included laying brick for commercial and residential buildings per JT Thorpe's policies, procedures, and building specifications.

60.     Carter was JT Thorpe's hourly employee.

61.     Indeed, JT Thorpe agreed to pay Carter approximately $35/hour for his first 40 hours worked each week plus overtime for his hours worked over 40 in a week.

62.     Carter reported his hours worked to JT Thorpe.

63.     JT Thorpe's records reflect the hours Carter worked each week.

64.     Carter typically worked 10 hours a day for 4 days a week plus 8 hours a day for 2 days a week (or 56 hours a week) "on the clock."

65.     But throughout his employment, JT Thorpe did not pay Carter for all his hours worked.

66.     Instead, JT Thorpe subjected Carter to its uniform, illegal shuttle practice that required him to work significant time "off the clock" without pay.

67.     Specifically, because JT Thorpe employees (like Carter) do not live at or near their assigned jobsites, JT Thorpe contracts with third-party shuttle services that pick these workers up from designated locations before their shifts and transport them to their assigned jobsite.

68.     Likewise, these same third-party shuttle services pick up JT Thorpe employees (like Carter) from the jobsite and transport them back to their designated locations after each shift.

69.     JT Thorpe prohibited Carter (and all its Hourly Employees) from traveling to and from the jobsite using his own vehicle (or any other personal means).

70.     In fact, per JT Thorpe policy, Carter (like all JT Thorpe employees) could not access or enter the jobsite *unless* he took the shuttle.

71.     In other words, JT Thorpe required Carter to shuttle to and from the jobsite with other JT Thorpe employees as a condition of his employment.

72.     To board these mandatory shuttles, Carter had to present and scan his JT Thorpe employee ID badge for security purposes.

73.     Carter spent approximately an hour each day (or 6 hours a week) shuttling to and from the jobsite.

74.     But per JT Thorpe's policy, Carter could not "clock in" for his shifts until he arrived at the jobsite (after his 30-minute shuttle to the jobsite) and was required to "clock out" for his shifts when he left the jobsite (before his 30-minute shuttle back to the designated location).

75.     In other words, JT Thorpe required Carter to work "off the clock," shuttling to and from the jobsite before and after each shift.

76.     But under its illegal shuttle practice, JT Thorpe did not pay Carter for this daily, required "off the clock" work.

77.     As a result, JT Thorpe failed to pay Carter overtime wages for all his overtime hours worked, including those worked "off the clock," in violation of the PMWA.

78.    Further, throughout his employment, JT Thorpe failed to pay Carter overtime at the proper premium rate.

79.    Instead, JT Thorpe subjected Carter to its uniform, illegal per diem pay scheme.

80.    Specifically, JT Thorpe labeled some of Carter's wages (approximately $100 a day) as "per diem."

81.    JT Thorpe knew that, as wages, Carter's so-called "per diem" should have been, but were not, included in his "regular rate" for overtime purposes

82.    Thus, under its illegal per diem pay scheme, JT Thorpe failed to pay Carter overtime at a rate not less than 1.5 times his regular rate of pay—based on *all* remuneration received—for the hours he worked over 40 in a week in violation of the FLSA and PMWA.

83.    Carter and the other Hourly Employees perform their jobs under JT Thorpe's supervision and use materials, equipment, and technology JT Thorpe approves and supplies.

84.    JT Thorpe requires Carter and its other Hourly Employees to follow and abide by common work, time, pay, and overtime policies and procedures in the performance of their jobs.

85.    At the end of each pay period, Carter and the other Hourly Employees receive wages from JT Thorpe that are determined by common systems and methods that JT Thorpe selects and controls.

86.    JT Thorpe requires Carter and its other Hourly Employees to report their hours worked to JT Thorpe.

87.    Thus, JT Thorpe's records show the hours the Hourly Employees (like Carter) work each week.

88.    Like Carter, the other Hourly Employees typically work 56 hours a week "on the clock."

89.    But just as with Carter, JT Thorpe does not pay its other Hourly Employees for all their hours worked.

90.    Instead, JT Thorpe subjects its other Hourly Employees to its same illegal shuttle practice that it imposed on Carter and requires them to work significant time "off the clock" without pay.

91.    That is, because the Hourly Employees (like Carter) do not live at or near their assigned jobsites, JT Thorpe contracts with third-party shuttle services that pick these workers up from designated locations before their shifts and transport them to their assigned jobsite.

92.    Likewise, these same third-party shuttle services pick up the Hourly Employees (like Carter) from the jobsite and transport them back to their designated locations after each shift.

93.    And just as with Carter, JT Thorpe prohibits its other Hourly from traveling to and from the jobsite using their own vehicles (or any other personal means).

94.    In fact, per JT Thorpe policy, the Hourly Employees (like Carter) cannot access or enter the jobsite *unless* they take the shuttle.

95.    In other words, JT Thorpe requires its Hourly Employees (like Carter) to shuttle to and from the jobsite with other JT Thorpe employees as a condition of their employment.

96.    To board these mandatory shuttles, the Hourly Employees (like Carter) must present and scan their JT Thorpe employee ID badges for security purposes.

97.    And like Carter, the other Hourly Employees spend approximately an hour each day (or 6 hours a week) shuttling to and from their jobsites.

98.    But per JT Thorpe's policy, the Hourly Employees (like Carter) cannot "clock in" for their shifts until they arrive at the jobsite (after shuttling to the jobsite) and are required to "clock out" for their shifts when they leave the jobsite (before shuttling back to the designated location).

99.     In other words, just as with Carter, JT Thorpe requires its other Hourly Employees to work "off the clock," shuttling to and from the jobsite before and after each shift.

100.     But under its illegal shuttle practice, JT Thorpe does not pay its Hourly Employees (like Carter) for this daily, required "off the clock" work.

101.     JT Thorpe controls its Hourly Employees' "off the clock" shuttling, and JT Thorpe requires them to perform this "off the clock" work as a condition of their employment.

102.     Indeed, the Hourly Employees' mandatory "off the clock" shuttling is a fundamental requirement of their work with JT Thorpe.

103.     And the Hourly Employees routinely perform this required "off the clock" shuttling for JT Thorpe's—not their own—predominant benefit.

104.     JT Thorpe knows its Hourly Employees perform this compensable "off the clock" work because JT Thorpe requires them to do so.

105.     Thus, JT Thorpe requested, suffered, permitted, or allowed its Hourly Employees (like Carter) to work "off the clock" shuttling to and from the jobsite before and after their shifts.

106.     Despite accepting the benefits, JT Thorpe does not pay its Hourly Employees (like Carter) for the time they spend shuttling to and from the jobsite "off the clock."

107.     Thus, under its illegal shuttle practice, JT Thorpe does not pay Carter and its other Hourly Employees overtime wages for all overtime hours worked, including those worked "off the clock," in violation of the PMWA.

108.     Finally, JT Thorpe also subjects its other Hourly Employees to the same illegal per diem pay scheme it imposed on Carter.

109.     Specifically, just as with Carter, JT Thorpe labels some of its Hourly Employees' wages as "per diem."

110.    JT Thorpe knows that, as wages, the Hourly Employees' so-called "per diems" must be, but are not, included in their "regular rates" for overtime purposes.

111.    As a result, JT Thorpe fails to pay Carter and its other Hourly Employees overtime at rates not less than 1.5 times their regular rates of pay—based on *all* remuneration received—for their hours worked over 40 in a week in violation of the FLSA and PMWA.

### JT THORPE'S VIOLATIONS WERE WILLFUL AND DONE IN RECKLESS DISREGARD OF THE FLSA AND PENNSYLVANIA LAW

112.    Carter incorporates all other paragraphs by reference.

113.    JT Thorpe knew it was subject to the FLSA and PMWA's overtime provisions.

114.    JT Thorpe knew the FLSA and PMWA required it to pay non-exempt employees, including its Hourly Employees, overtime at rates not less than 1.5 times their regular rates of pay—based on *all* remuneration received—for all hours worked after 40 in a week.

115.    JT Thorpe knew each Hourly Employee worked more than 40 hours in at least one workweek during the last 3 years because these employees reported their hours worked to JT Thorpe.

116.    JT Thorpe knew its Hourly Employees were non-exempt employees entitled to overtime pay.

117.    JT Thorpe knew the Hourly Employees were its hourly employees.

118.    JT Thorpe knew it paid its Hourly Employees on an hourly basis.

119.    JT Thorpe knew it also paid its Hourly Employees "per diems."

120.    JT Thorpe knew its Hourly Employees' "per diems" were tied to the number of days they worked.

121.    JT Thorpe knew the per diems constituted part of its Hourly Employees' wages.

122.    And JT Thorpe knew that all of its Hourly Employees' wages (including their per diems) were considered remuneration for overtime purposes under Federal and Pennsylvania law.

123.    Nonetheless, JT Thorpe excluded the per diems from its Hourly Employees' regular rates of pay for overtime purposes.

124.    JT Thorpe's decision to exclude the per diems from its Hourly Employees' regular rates of pay for overtime purposes was neither reasonable nor made in good faith.

125.    JT Thorpe knew the PMWA required it to pay employees, including its Hourly Employees, for all hours they performed compensable work.

126.    JT Thorpe knew that, as the Hourly Employees' employer, it had a duty to ensure they were not performing work "off the clock" (without pay) that JT Thorpe did not want performed.

127.    JT Thorpe knew it required its Hourly Employees to shuttle to and from their assigned jobsites before and after each shift "off the clock."

128.    JT Thorpe knew it controlled its Hourly Employees' "off the clock" shuttling.

129.    JT Thorpe knew its Hourly Employees' mandatory "off the clock" shuttling was a fundamental requirement of their jobs with JT Thorpe.

130.    JT Thorpe knew its Hourly Employees routinely performed this daily, required "off the clock" shuttling for JT Thorpe's—not their own—predominant benefit.

131.    In other words, JT Thorpe knew its Hourly Employees performed compensable work (e.g., shuttling to and from their assigned jobsites) "off the clock."

132.    Nonetheless, JT Thorpe did not pay its Hourly Employees for the required "off the clock" work they performed before and after each shift.

133.    Thus, JT Thorpe knew, should have known, or recklessly disregarded whether it failed to pay its Hourly Employees for all their hours worked, including those worked "off the clock" while shuttling to and from the jobsite.

134.    In other words, JT Thorpe knew, should have known, or recklessly disregarded whether it failed to pay its Hourly Employees overtime wages for all overtime hours worked, including those worked "off the clock," in violation of the PMWA.

135.    JT Thorpe's decision not to pay its Hourly Employees for the time they spent shuttling to and from the jobsite "off the clock" was neither reasonable nor made in good faith.

136.    JT Thorpe's decision not to pay its Hourly Employees overtime wages for all overtime hours worked was neither reasonable nor made in good faith.

137.    JT Thorpe's decision not to pay its Hourly Employees earned wages for all hours worked on their regular paydays and following the termination of their employment was neither reasonable nor made in good faith.

138.    JT Thorpe's failure to pay its Hourly Employees their proper earned wages was not the result of a *bona fide* dispute.

139.    JT Thorpe knew its conduct described in this Complaint violated the FLSA and PMWA.

140.    JT Thorpe knowingly, willfully, and/or in reckless disregard carried out its illegal shuttle practice and per diem pay scheme that deprived Carter and the other Hourly Employees of earned wages for all hours worked and overtime at the proper premium rate for all hours worked after 40 in a week in violation of the FLSA and PMWA.

### CLASS AND COLLECTIVE ACTION ALLEGATIONS

141.    Carter incorporates all other paragraphs by reference.

142.    Carter brings his claims on behalf of himself and the other Hourly Employees as an FLSA collective action and class action pursuant to FED. R. CIV. P. 23.

143.    Carter alleges on behalf of himself and the other Hourly Employees that JT Thorpe violated, and is violating, the FLSA and PMWA by failing to pay these employees overtime at rates

not less than 1.5 times their regular rates of pay—based on *all* remuneration received—for all hours worked over 40 in a week, including those worked "off the clock."

144.    Like Carter, the other Hourly Employees were victimized by JT Thorpe's illegal shuttle practice and per diem pay scheme.

145.    Other Hourly Employees worked with Carter and indicated they were paid in the same manner, performed similar work, and were subject to JT Thorpe's same illegal shuttle practice and per diem pay scheme.

146.    Based on his experience with JT Thorpe, Carter is aware JT Thorpe's illegal shuttle practice and per diem pay scheme were imposed on the other Hourly Employees.

147.    Upon information and belief, the putative class of Hourly Employees includes more than 40 members.

148.    Thus, the putative class of Hourly Employees is so numerous that joinder of all members in one lawsuit is impracticable.

149.    While the exact number of Hourly Employees is unknown to Carter at this time, they can be readily and easily identified from JT Thorpe's business and personnel records.

150.    The Hourly Employees are similarly situated in the most relevant respects.

151.    Even if their precise job duties and locations might vary, these differences do not matter for the purposes of determining their entitlement to earned wages for all hours worked and overtime at the proper premium rate for all hours worked after 40 in a week.

152.    Therefore, the specific job titles or precise locations of the Hourly Employees do not prevent class treatment.

153.    Rather, the putative class of Hourly Employees is held together by JT Thorpe's illegal shuttle practice and per diem pay scheme, which systematically deprived Carter and the other Hourly

Employees of earned wages for all hours worked and overtime at the proper premium rate for all hours worked after 40 in a week.

154.    JT Thorpe's failure to pay these employees to earned wages for all hours worked and overtime at the proper premium rate for all hours worked after 40 in a week as required by the PMWA results from generally applicable, systematic policies and practices which are not dependent on the personal circumstances of the Hourly Employees.

155.    JT Thorpe's records reflect the hours the Hourly Employees recorded they worked each week.

156.    JT Thorpe's records also reflect the time the Hourly Employees spent shuttling to and from their assigned jobsites each week.

157.    Further, JT Thorpe's records reflect it paid the Hourly Employees "per diems" in addition to their regular hourly pay.

158.    And JT Thorpe's records reflect its Hourly Employees' "per diems" were excluded from their regular rates of pay for overtime purposes.

159.    The back wages owed to Carter and the other Hourly Employees can therefore be calculated using the same formula applied to the same records.

160.    Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to JT Thorpe's records, and there is no detraction from the common nucleus of liability facts.

161.    Therefore, the issue of damages does not preclude class treatment.

162.    Carter's experiences are therefore typical of the experiences of the other Hourly Employees.

163.    Carter has no interest contrary to, or in conflict with, the other Hourly Employees that would prevent class treatment.

164.    Like each Hourly Employee, Carter has an interest in obtaining the unpaid wages owed under Pennsylvania law.

165.    Carter and his counsel will fairly and adequately protect the interests of the Hourly Employees.

166.    Carter retained counsel with significant experience in handling complex class action litigation.

167.    A class action is superior to other available means for fair and efficient adjudication of this lawsuit.

168.    Absent this class action, many Hourly Employees will not obtain redress for their injuries, and JT Thorpe will reap the unjust benefits of violating the PMWA.

169.    Further, even if some of the Hourly Employees could afford individual litigation against JT Thorpe, it would be unduly burdensome to the judicial system.

170.    Indeed, the multiplicity of actions would create a hardship to the Hourly Employees, the Court, and JT Thorpe.

171.    Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

172.    The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual members.

173.    Among the common questions of law and fact are:

    a.    Whether JT Thorpe required its Hourly Employees to shuttle to and from the jobsite "off the clock" before and after their shifts;

    b.    Whether JT Thorpe failed to pay its Hourly Employees overtime wages for all their overtime hours worked, including the time they spent

shuttling to and from the jobsite "off the clock," in violation of the PMWA;

c.    Whether JT Thorpe paid its Hourly Employees per diems that were excluded from their regular rates of pay for overtime purposes;

d.    Whether JT Thorpe failed to pay its Hourly Employees overtime at rates not less than 1.5 times their regular rates of pay—based on *all* remuneration received—for their hour worked after 40 in a week in violation of the FLSA and PMWA; and

e.    Whether JT Thorpe's failure to pay its Hourly Employees earned wages was the result of a *bona fide* dispute.

174.    Carter knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class action.

175.    As part of its regular business practices, JT Thorpe intentionally, willfully, and repeatedly violated the FLSA and the PMWA with respect to Carter and the other Hourly Employees.

176.    JT Thorpe's illegal shuttle practice and per diem pay scheme deprived Carter and the other Hourly Employees of the earned wages for all hours worked and overtime at the proper premium rate for all hours worked after 40 in a week, which they are owed under federal and Pennsylvania law.

177.    JT Thorpe has acted, or has refused to act, on grounds generally applicable to the Hourly Employees, thereby making relief with respect to the putative class of Hourly Employees, as a whole, appropriate.

178.    Carter and the other Hourly Employees he seeks to represent have suffered, and will continue to suffer, irreparable damage from JT Thorpe's illegal shuttle practice and per diem pay scheme.

### JT THORPE'S VIOLATIONS WERE NOT DONE IN GOOD FAITH

179.    Carter incorporates all other paragraphs by reference.

180.    JT Thorpe did not seek the advice of counsel regarding paying its Hourly Employees according to its per diem pay scheme.

181.    JT Thorpe did not receive advice from counsel regarding paying its Hourly Employees according to its per diem pay scheme.

182.    JT Thorpe did not rely on the advice of counsel in deciding to pay its Hourly Employees according to its per diem pay scheme.

183.    JT Thorpe's decision to pay its Hourly Employees under its per diem pay scheme was neither reasonable nor made in good faith. JT Thorpe did not seek the advice of counsel regarding its shuttle practice.

184.    JT Thorpe did not receive advice from counsel regarding its shuttle practice.

185.    JT Thorpe did not rely on the advice of counsel in deciding to implement its shuttle practice.

186.    JT Thorpe's decision to utilize its shuttle practice was neither reasonable nor made in good faith.

### COUNT I

### FAILURE TO PAY OVERTIME WAGES UNDER THE FLSA
### (FLSA COLLECTIVE MEMBERS)

187.    Carter realleges and incorporates all other paragraphs by reference.

188.    Carter brings his FLSA claim as a collective action on behalf of himself and the other FLSA Collective Members pursuant to 29 U.S.C. § 216(b).

189.    JT Thorpe violated, and is violating, the FLSA by failing to pay non-exempt employees, including Carter and the FLSA Collective Members, overtime wages at rates not less than 1.5

times these employees' regular rates of pay – based on all renumeration received – for all hours worked in excess of 40 a workweek.

190.     Throughout the relevant period, JT Thorpe paid Carter and the FLSA Collective Members per diems that JT Thorpe failed to include in calculating these non-exempt employees' regular rates of pay for overtime purposes.

191.     JT Thorpe's unlawful conduct harmed Carter and the other FLSA Collective Members by depriving them of the overtime wages they are owed.

192.     Accordingly, JT Thorpe owes Carter and the other FLSA Collective Members the difference between the rate actually paid and the proper overtime rate.

193.     Because JT Thorpe knew, or showed reckless disregard for whether, its per diem pay scheme violated the FLSA, JT Thorpe owes Carter and the other FLSA Collective Members these wages for at least the past 3 years.

194.     JT Thorpe is also liable to Carter and the other FLSA Collective Members for an amount equal to all their unpaid wages as liquidated damages.

195.     Finally, Carter and the other FLSA Collective Members are entitled to recover all reasonable attorney's fees and costs incurred in this action.

## COUNT II

### FAILURE TO PAY OVERTIME WAGES UNDER THE PMWA
### (PENNSYLVANIA CLASS MEMBERS)

196.     Carter incorporates all other paragraphs by reference.

197.     Carter brings his PMWA claims as state-wide class action on behalf of himself and the other Pennsylvania Class Members pursuant to FED. R. CIV. P. 23.

198.     JT Thorpe's conduct violates the PMWA (43 PA. STAT. §§ 333.101, *et seq.*).

199.     At all relevant times, JT Thorpe was subject to the PMWA because JT Thorpe was (and is) an "employer" within the meaning of the PMWA. *See* 43 PA. STAT. § 333.103(g).

200.     At all relevant times, JT Thorpe employed Carter and each Hourly Employee as its covered "employees" within the meaning of the PMWA. *See* 43 PA. STAT. § 333.103(h).

201.     The PMWA requires employers, like JT Thorpe, to pay non-exempt employees, including Carter and the other Hourly Employees, overtime at rates not less than 1.5 times their regular rates of pay—based on *all* remuneration received—for all hours worked after 40 in a week. 43 PA. STAT. § 333.104(c); *see* 34 PA. CODE §§ 231.41-43.

202.     JT Thorpe's uniform, illegal shuttle practice and per diem pay scheme imposed on Carter and the other Hourly Employees failed to comply with 43 PA. STAT. § 333.104(c) and/or 34 PA. CODE §§ 231.41-43.

203.     Specifically, JT Thorpe violated, and is violating, the PMWA by employing non-exempt employees (Carter and the other Hourly Employees) for workweeks longer than 40 hours without paying such employees overtime at rates not less than 1.5 times their regular rates of pay—based on *all* remuneration received—for all their hours worked after 40 in a week, including those worked "off the clock." *See* 43 PA. STAT. § 333.104(c); *see also* 34 PA. CODE §§ 231.41-43.

204.     JT Thorpe's unlawful conduct harmed Carter and the other Hourly Employees by depriving them of the overtime wages they are owed.

205.     Accordingly, JT Thorpe owes Carter and the other Hourly Employees the difference between the overtime wages paid and the proper overtime wages earned, plus prejudgment interest and all available penalty wages. *See* 43 PA. STAT. § 333.113.

206.     Finally, Carter and the other Hourly Employees are entitled to recover their reasonable attorneys' fees and costs incurred in this action. *See* 43 PA. STAT. § 333.113.

### JURY DEMAND

207.     Carter demands a trial by jury on all Counts.

**RELIEF SOUGHT**

WHEREFORE, Carter, individually and on behalf of the other Hourly Employees, seeks the following relief:

a.    An Order designating this lawsuit as a collective action and authorizing notice pursuant to 29 U.S.C. § 216(b) be sent to the Hourly Employees allowing them to join this action by filing a written notice of consent;

b.    An Order certifying this lawsuit as a class action pursuant to FED. R. CIV. P. 23;

c.    An Order finding JT Thorpe liable to Carter and the other FLSA Collective Members for unpaid overtime wages owed under the FLSA plus liquidated damages in an amount equal to their unpaid wages;

d.    An Order finding JT Thorpe liable to Carter and the other Hourly Employees for unpaid overtime wages owed under the PMWA, plus all available penalties;

e.    A Judgment awarding Carter and the other Hourly Employees all unpaid wages, liquidated damages, statutory damages, and any other penalties available under the FLSA and PMWA;

f.    An Order awarding attorneys' fees, costs, and expenses;

g.    An Order awarding pre- and post-judgment interest at the highest applicable rates; and

h.    An Order awarding such other and further relief as may be necessary and appropriate.

Respectfully submitted,

By: */s/ Michael A. Josephson*
    Michael A. Josephson, Esquire
    PA ID No. 308410
    Andrew W. Dunlap, Esquire
    TX Bar No. 24078444
    Alyssa J. White
    TX Bar No. 24073014
    JOSEPHSON DUNLAP LLP
    11 Greenway Plaza, Suite 3050
    Houston, Texas 77046
    Tel: 713-352-1100
    Fax: 713-352-3300
    mjosephson@mybackwages.com
    adunlap@mybackwages.com
    awhite@mybackwages.com

    Joshua P. Geist, Esquire
    PA ID No. 85745
    William F. Goodrich, Esquire
    PA ID No. 30235
    GOODRICH & GEIST, PC
    3634 California Avenue
    Pittsburgh, Pennsylvania 15212
    Tel: (412) 766-1455
    Fax: (412) 766-0300
    josh@goodrichandgeist.com
    bill@goodrichandgeist.com

    Richard J. (Rex) Burch, Esquire*
    TX Bar No. 24001807
    BRUCKNER BURCH PLLC
    11 Greenway Plaza, Suite 3025
    Houston, Texas 77046
    Tel: (713) 877-8788
    Fax: (713) 877-8065
    rburch@brucknerburch.com

    **ATTORNEYS FOR CARTER &
    THE HOURLY EMPLOYEES**

<u>**CERTIFICATE OF SERVICE**</u>

On July 31, 2024, I served a copy of this document on all registered parties and/or their counsel of record via the Court's CM/ECF system.

*/s/ Michael A. Josephson*
Michael A. Josephson